**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-1328
_____

JERRY J. PAINADATH,
                                        Appellant
v.

GOOD SHEPHERD PENN PARTNERS
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. Civil Action No. 2:22-cv-03604)
District Judge: Honorable Gerald J. Pappert
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 17, 2026
Before:   MATEY, MONTGOMERY-REEVES, and NYGAARD, *Circuit Judges*

(Opinion filed: July 10, 2026)
_____

OPINION*
_____

PER CURIAM

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Pro se appellant Jerry J. Painadath appeals from the District Court's grant of summary judgment for his former employer, Good Shepherd Penn Partners ("GSPP"), and its imposition of a spoliation sanction. For the reasons that follow, we will affirm the District Court's judgment.

I.

In 2020, Painadath began working for GSPP as a clinical nurse at an inpatient rehabilitation unit that GSPP operates.[1] In June 2021, Painadath emailed GSPP's quality assurance manager to share a concern that three of his recent African American patients were not told that they were a "high fall risk," while two "Caucasian patients were full[y] aware they are fall risk," leading him to request an "assessment tool to measure quality of healthcare personnel-patient interactions received in a previous setting." Appellant's App'x, Vol. 2, at 552. The manager thanked Painadath, asked follow-up questions, and offered to meet with him.

In August 2021, there was an incident between Painadath and a Certified Nursing Assistant ("CNA") co-worker. The CNA claimed that Painadath was aggressive, condescending, and belittling to her, while Painadath claimed that the CNA called him derogatory names and threw an alcohol swab at him. After an investigation, both parties were found to have engaged in unprofessional behavior and were issued written discipline, with a warning that further unprofessional conduct could result in additional

---

[1] Because we write primarily for the parties, we will recite only the facts necessary for this discussion. These facts are undisputed unless otherwise noted.

discipline, including termination.

In September and early October 2021, Painadath's supervisor, Nurse Manager Melissa Lattanzio, began preparing evaluations for her direct reports. She received unsolicited feedback from nearly every nurse and CNA who worked with Painadath that he was rude, difficult to work with, and condescending. Staff members also claimed that Painadath avoided providing personal hygiene and toileting for patients himself, and often refused to help his co-workers with those duties.[2] Lattanzio reported this feedback to her supervisor and human resources, who considered further discipline for Painadath but ultimately decided to gather more details about these incidents before taking additional disciplinary action.

In late October 2021, there was an incident involving Painadath and CNA Jasmine Harris. According to Harris, Painadath directed her to change a patient, and when she asked why he did not do it himself, he said it was not his job and began yelling at her. Harris claimed that because she felt afraid and unsafe, she went to the elevator to report the incident, but Painadath followed her, stared at her, got out of the elevator with her, and continued staring at her while she went to make her report. Harris was reassigned to work with a different nurse, per her request.

Painadath denied yelling at, staring at, or following Harris, and claimed that he sought Harris's assistance because he needed a second person to help change the patient.

---

[2]  Lattanzio also received a direct report of concerning behavior in mid-September 2021 from a CNA involving a conflict over toileting a patient.

In his account, Harris refused to help, indicated that Painadath should do it himself, and ran away. Painadath claimed that he went to the elevator because he thought there was an emergency and that he got off the elevator with Harris because he was also planning to report the incident.

When the clinical coordinator spoke with Painadath about Harris's reassignment and began explaining to him that both CNAs and nurses were responsible for patient care, she reported that Painadath became angry and walked away from her. Later that day, Painadath was suspended pending an investigation of the incident.

Administrative Director of Human Resources Scott Moynihan found Painadath to be "vague and not credible" during the investigation, and observed "troubling and at times bizarre" behavior from Painadath. *Id.* at 264. Given his concerns, Moynihan hired a threat assessment firm to evaluate the incident. The firm interviewed Painadath and a dozen coworkers, concluding that Painadath posed a "moderate level of risk for aggressive behavior of violence." *Id.* at 266. The report — produced to Moynihan on November 29, 2021 — determined that Painadath had a negative attitude toward his female co-workers, and that several co-workers did not believe he was performing essential patient care when a CNA was unavailable. Multiple staff members had requested not to work with Painadath because of his behavior. Painadath reported that he was the victim of a conspiracy when he was interviewed.

Meanwhile, during his suspension in November 2021, Painadath contacted Pennsylvania Adult Protective Services ("APS") to report "a patient negligent situation,"

4

but could not provide the demographic data that APS requested. Then on December 5, 2021, Painadath filed a whistleblower complaint with the Occupational Safety and Health Administration ("OSHA"), claiming that GSPP took adverse actions against him for reporting "[c]hronic gross neglect of vulnerable and elderly black and brown patients." *Id.* at 557-58.

Moynihan recommended Painadath's termination, based on the threat assessment and his disciplinary history, and he was fired on December 14, 2021. The termination letter stated that Painadath violated the code of conduct.

Painadath initiated this federal lawsuit in 2022. In his operative complaint, as relevant here, he brought claims against GSPP under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Affordable Care Act ("ACA"), and Pennsylvania's Older Adult Protective Services Act ("OAPSA").[3] After discovery was complete, GSPP moved for sanctions against Painadath, seeking the dismissal of his Title VII claims based on Painadath's actions during discovery. The District Court held a hearing and granted GSPP's motion. GSPP then sought summary judgment on Painadath's remaining ACA and OAPSA claims, which the District Court granted. Painadath timely appealed.

---

[3] Painadath raised additional claims and named additional defendants in this litigation, but he does not discuss the dismissal of those claims or defendants in his appellate brief and has thus forfeited any challenge to those decisions. *See In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (explaining that any issue that an appellant fails to develop in an opening brief is forfeited). We also do not consider any arguments Painadath makes for the first time on appeal, *see Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 88 n.12 (3d Cir. 2013), or any issues he discusses for the first time in his reply brief, *see Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017).

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment for GSPP. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We review a District Court's "decision to impose sanctions for discovery violations" for abuse of discretion. *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 134 (3d Cir. 2009) (internal quotation marks and citation omitted).

## III.

We agree with the District Court's grant of summary judgment. First, Painadath did not establish a prima facie case of retaliation under the ACA. *See Lucas v. VHC Health*, 128 F.4th 213, 224 (4th Cir. 2025) (explaining that the ACA amended the Fair Labor Standards Act to include an express anti-retaliation provision for an employee who reports "any act or omission the employee reasonably believes to be a violation of" the ACA per 29 U.S.C. § 218c(a)(2)). To state a prima facie case of ACA retaliation, Painadath had to show, inter alia., a causal link between his alleged protected activity —

6

his June 2021 email and his December 2021 OSHA complaint — and his termination.[4]

*See id.* at 225 (requiring a plaintiff to show "a causal connection . . . between the protected activity and the adverse action" to state a prima facie case of ACA retaliation); *cf. Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (listing elements of a prima facie case of discriminatory retaliation in the Title VII context).

Even if Painadath's June 2021 email could somehow be interpreted as a report of an ACA violation, there is no evidence that anyone involved with his termination was aware of this email. Painadath does not argue otherwise on appeal. And although GSPP was made aware of Painadath's OSHA complaint on December 5, nine days before Painadath was fired on December 14, a jury could not find a causal connection between the complaint and Painadath's termination given the other record evidence in this case. *Cf. Kachmar*, 109 F.3d at 178 (emphasizing that causation in a retaliation claim "is highly context-specific" and that although temporal proximity can provide a basis from which to draw an inference of causation, "it is causation, not temporal proximity itself, that is an element of [a] plaintiff's prima facie case").

Painadath was formally disciplined in August 2021, and then again in October 2021, when he was suspended. Additional discipline was already being considered

---

[4] The District Court applied a lower causation standard, citing caselaw in the context of other federal whistleblower statues to determine that Painadath failed to show that his alleged protected activity was a "contributing factor" in his termination. We have not defined the causation threshold to state a prima facie case of ACA retaliation but need not do so here; under any conceivable standard, Painadath has not shown that his alleged protected activity played a role in his termination.

before the incident with Harris. The investigative firm provided its report to Moynihan nearly a week before Painadath submitted his OSHA complaint, concluding that he presented a risk of aggressive behavior. Further, many of Painadath's co-workers reported serious issues with his workplace behavior before he was suspended and several had requested not to work with him. Given Painadath's disciplinary history and the ongoing disciplinary proceeding that led to his termination, no reasonable fact-finder could conclude that he was fired in retaliation for submitting an OSHA complaint.[5]

Next, summary judgment was properly granted for GSPP on Painadath's OAPSA retaliation claim. The OAPSA prohibits retaliation against reports "that an older adult is in need of protective services" when it is reported "to the agency which is the local provider of protective services." 35 Pa. Stat. § 10225.302(a). The District Court concluded that Painadath could not have reasonably believed that he was reporting

---

[5] Painadath largely relies on temporal proximity to argue otherwise, and on his belief that Lattanzio was biased against him because she wanted Painadath to "toilet the patient, ordinarily a[n] 'essential function' of [a] . . . 'CNA.'" Appellant's Br. at 18-21. Neither of these arguments suggest a causal connection between Painadath's OSHA report and his termination. Painadath also argues that GSPP is precluded from relying on his disciplinary history to support the termination because, in granting him unemployment benefits, the unemployment compensation office concluded that GSPP had "provided insufficient information" in that proceeding to demonstrate his "willful misconduct." *See* Appellant's Br. at 13-16; Appellant's App'x, Vol. 3, at 2. Assuming that issue preclusion would otherwise apply in this context, there is no basis in the record to conclude that that proceeding involved the same issues, and no evidence of what GSPP argued or presented there. *See Burlington N. R. Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) (listing the elements of issue preclusion, including that the issue was "actually litigated" and "determined by a final and valid judgment") (internal quotation marks and citation omitted).

negligence in his November 2021 call to APS, and that, in any event, there was no causal connection between the call and his firing. Painadath does not challenge these conclusions in his appellate brief. He contends only that he was suspended because he informed the clinical coordinator during the October 2021 incident with Harris that he believed Harris was neglecting a patient. But Painadath does not cite any evidence that this clinical coordinator was "the agency which is the local provider of protective services" per § 10225.302(a).[6] Accordingly, his suspension could not have violated the OAPSA's retaliation protections.

Finally, the District Court did not abuse its discretion in sanctioning Painadath. Early in the litigation, GSPP sought to dismiss Painadath's Title VII claims as time-barred, arguing that he downloaded his Notice of Right to Sue ("NRTS") from the EEOC's online portal on October 31, 2022, and thus had notice of it more than 90 days before he brought his claims. On GSPP's motion, the District Court ordered Painadath to produce any documents he downloaded from the EEOC's online portal, or if there were none, to produce the electronic devices he used during the relevant time for inspection.

---

[6] Painadath argues that his conversation with the clinical coordinator falls within the OAPSA because it permits an employee reporting abuse to request that an administrator "make or to assist the employee to make the oral and written reports required by this subsection." *See* 35 Pa. Stat. § 10225.701(a)(3). An administrator is defined as "the person responsible for the administration of a facility," including those "responsible for employment decisions or an independent contractor." *Id.* § 10225.103. There is no record evidence that the clinical coordinator was responsible for the administration of the inpatient rehabilitation unit or for employment decisions.

9

The District Court warned him that failure to comply could result in sanctions.[7]  For weeks, Painadath refused to identify the relevant devices and went back and forth about his availability.  He expressed that he wanted his devices back the same day as the inspection and was told that might be possible if he arrived before 10 A.M.  He also stated that he forgot the password for his computer.

Ultimately, Painadath provided his iPhone and laptop for a forensic inspection at TransPerfect, GSPP's vendor, after noon on August 15, 2024.  A cockroach crawled out of one of the laptop's vents at initial inspection, and the laptop would not turn on after being charged.  Because the laptop was inoperable, TransPerfect was unable to conduct its forensic examination.  TransPerfect also began to examine Painadath's iPhone, but Painadath demanded to have it back before the inspection could be completed.  Several days later, Painadath returned with the phone, and TransPerfect completed its inspection.  However, during its prior collection attempt, the iPhone was using 246 GB of storage, while during the second collection, it had only 215 GB of storage in use.  The examination did not conclusively determine whether the iPhone had accessed or downloaded documents from the EEOC's online portal.

GSPP moved for sanctions under Federal Rules of Civil Procedure 37(b) and (e) for violating a discovery-related court order and spoliating electronically stored

---

[7]  GSPP required the District Court's intervention to get Painadath's cooperation in the discovery process, as Painadath objected to nearly all of its discovery requests, failed to produce responsive documents, and retracted his previous consent to have GSPP conduct a forensic inspection of his electronic devices.

information ("ESI"), and the District Court held a hearing where Painadath testified that he removed a device management software from his iPhone between the two inspections, but did not know how much storage that took up and could not otherwise explain why 31 GB of data were missing from the phone. Further, Painadath testified that his laptop had been inoperable since 2023. He denied downloading his NRTS from the EEOC's online portal on October 31, 2022, but stated that he had uploaded documents to the EEOC portal with his iPhone or laptop that same week. A TransPerfect forensic examiner who handled Painadath's devices testified that there were no guaranteed options to recover data from the laptop, and an attempt would cost thousands of dollars.

The District Court granted GSPP's motion, concluding that Painadath intentionally violated its order to produce his devices for inspection when he produced a laptop that he knew was inoperable and deleted data from his iPhone before the second inspection. It concluded that this prejudiced GSPP because there was no way to recover any lost ESI from Painadath's iPhone about his EEOC portal access, and only an uncertain and expensive avenue to potentially recover lost ESI from the broken laptop remained. The District Court found that Painadath was not credible regarding several issues and noted that he made no attempt to back up the data on either of his devices during this litigation, despite his obligation to do so. The District Court considered the *Poulis* factors before issuing a dispositive sanction — presuming that Painadath downloaded the NRTS on October 31, 2022 — and dismissing Painadath's Title VII claims as time-barred. *See Knoll v. City of Allentown*, 707 F.3d 406, 409 n.2 (3d Cir. 2013) (listing *Poulis* factors).

11

On appeal, Painadath argues that: (1) he did not download the NRTS and never consented to its electronic delivery; (2) his devices could have been remotely erased by a third party; and (3) his explanations for the inoperability of his laptop and the data deletion should have been sufficient to conclude that he did not intentionally spoliate any data. However, his consent to electronic delivery is irrelevant to the question of whether he affirmatively accessed the NRTS once it was available for download on the portal. There is no evidence in the record that a third party somehow deleted his data. And he does not address the many issues identified by the District Court with the inconsistent and vague explanations he offered for his uncooperative behavior and deliberate misrepresentations during discovery, or his failure to back up the data on his devices during this litigation. Accordingly, Painadath has not demonstrated that the District Court abused its discretion in concluding that he accessed his NRTS on October 31, 2022 as a sanction for violating its order and thus dismissing his Title VII claims.

For these reasons, we will affirm the judgment of the District Court.